In re BAY PLASTICS, INC., Debtor.

BAY PLASTICS, INC., Plaintiff,

v.

BT COMMERCIAL CORP.,
et al., Defendants.

and related cross-actions.

Bankruptcy No. LA 90–01884 SB.
Adv. No. LA 92–01359–SB.

United States Bankruptcy Court,
C.D. California.

Sept. 5, 1995.

George A. Juarez and Catherine A. Steiner of Pachulski, Stang, Ziehl & Young, P.C., Los Angeles, CA, for debtor.

Ronnie H. Walker, Orlando, FL, and Earl Hagen, Hagen Hagen & Hagen, Encino, CA, for defendants.

## AMENDED MEMORANDUM OF DECISION ON SUMMARY JUDGMENT MOTION

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. INTRODUCTION

The debtor has brought this adversary proceeding against the selling shareholders of a leveraged buyout ("LBO") to recover the funds that they received in the buyout transaction. While the action was also brought against the bank that financed the transaction, the bank has settled. The Court grants summary judgment to the debtor on the undisputed facts.

The Court holds that the transaction may be avoided as a constructive fraudulent transfer under the California version of the Uniform Fraudulent Transfer Act ("UFTA"), on which the debtor relies pursuant to Bankruptcy Code § 544(b),[1] and that in consequence the debtor is entitled to recover against the selling shareholders. The Court finds that the transaction rendered the debtor insolvent, and that the sellers did not act in good faith.

### II. FACTS

The Court finds that the following facts are undisputed. Defendants Bob Younger, Abner Smith and Paul Dodson ("the selling shareholders") formed debtor Bay Plastics, Inc. ("Bay Plastics") in 1979 to manufacture polyvinyl chloride ("PVC") plastic pipe for water well casings and turf irrigation. Bay Plastics filed this bankruptcy case on January 25, 1990.

1. 11 U.S.C.A. § 544(b) (West 1993).

2. Apparently the deferred payments have not been made. All but $100,000 of the deferred payments were designated as compensation for a non-competition agreement.

3. The BT loan was structured to permit Nicole Plastics to make two acquisitions, the Bay Plastics purchase and the acquisition of Colby Plastic

### A. The Buyout

Because they were nearing retirement, on October 31, 1988 (fifteen months before this bankruptcy filing) the selling shareholders sold their Bay Plastics stock to Milhous Corporation ("Milhous") for $3.5 million in cash plus $1.8 million in deferred payments.[2] Milhous did not acquire the Bay Plastics stock directly. Instead, it caused its subsidiary Nicole Plastics to form its own subsidiary, BPI Acquisition Corp. ("BPI"), to take ownership of the Bay Plastics stock. Formally, the parties to the stock sale transaction were ultimately BPI and the selling shareholders.

The sale was unexceptional. The difficulty lay in the financing of the purchase. Milhous put no money of its own, or even any money that it borrowed, into this transaction. Instead, it caused Bay Plastics to borrow approximately $3.95 million from defendant BT Commercial Corp.[3] ("BT") (a subsidiary of Bankers Trust), and then caused Bay Plastics to direct that $3.5 million of the loan be disbursed to BPI. BPI in turn directed that the $3.5 million be paid directly to the selling shareholders in substantial payment for their stock. Thus, at the closing, $3.5 million of the funds paid into escrow by BT went directly to the selling shareholders.

As security for its $3.95 million loan, BT received a first priority security interest in essentially all of the assets of Bay Plastics. In consequence, BT has received all of the proceeds of debtor's assets in this bankruptcy case, and nothing is left for unsecured or even for administrative creditors.

The financing also provided a revolving credit facility for working capital, in addition to the payment for the LBO, up to a total loan of $7 million.[4] A total of just over $4 million was owing to BT at the time of the bankruptcy filing, according to the debtor's

Converters, Inc. The Colby part of the transaction was separate from the Bay Plastics part, except as to the financing, and it is not involved in this litigation.

4. While working capital advances were authorized up to $3.35 million, the Court has received no evidence on whether such advances were actually made.

schedules. Thus most of the debt (all but approximately $500,000) owing to BT at the time of the filing resulted from the LBO.

The selling shareholders were not in the dark about the financing. On October 25, 1988 they and their attorney met with Milhous representatives in Los Angeles to finalize the deal. While the Milhous representatives provided rather little information about the Milhous finances, they did disclose the details of the BT secured loan to Bay Plastics to finance the stock purchase. In addition, the selling shareholders received a projected post-transaction balance sheet, which showed a balance of $250,000 in equity only because of the addition to the asset side of the ledger the sum of $2,259,270 in goodwill. Both the selling shareholders and their attorney were experienced in LBOs, and the selling shareholders discussed this feature of the transaction, and their exposure on a fraudulent transfer claim, with their attorney on that date. With this information in hand, Younger, Smith and Dodson approved the terms of the sale.

In contrast to the selling shareholders, the industry did not know about the LBO character of the transaction until a number of months later. Shintech Corp., a creditor at the time of the transaction (and continuously thereafter), did not learn of it until ten months later, in August, 1989.

### B. The Shintech Debt

Some three months before the LBO, on July 22, 1988, Bay Plastics entered into a requirements contract with Shintech to supply PVC resin. Shintech agreed under the contract to supply up to 2.6 million pounds of PVC resin per month on payment terms of 30 days after shipment. To induce Shintech to enter into this contract, Bay Plastics granted Shintech a security interest in all its assets, and the shareholders gave personal guaranties. This arrangement stood in the way of the BT transaction.

In consequence, the selling shareholders, their attorney, and Milhous representatives met with Shintech in late October, 1988 (af-

ter Milhous had disclosed to the selling shareholders the terms of the LBO), to arrange a new deal with Shintech. The parties to the LBO persuaded Shintech of Milhous' good credit, and induced Shintech to release both its security interest and the guaranties.[5] However, they did not disclose the LBO character of the transaction, and Shintech did not learn of this until ten months later.

The impact of this transaction on the balance sheet of Bay Plastics was dramatic. Immediately after the transaction, its balance sheet showed tangible assets of approximately $7 million, and liabilities of approximately $9 million. Only the addition of almost $2.26 million in goodwill, which had not appeared on prior balance sheets, and for which no explanation has been provided, permitted the balance sheet to show a modest shareholder equity of $250,000. But for the newly discovered goodwill, there would have been a net deficiency of some $2 million. In contrast, immediately before the transaction Bay Plastics had assets of $6.7 million and liabilities of $5.6 million, and a net equity of $1.1 million.

Bay Plastics was unable to service this overload of debt, and filed its bankruptcy petition fifteen months later. According to the debtor's schedules, at the time of filing its two principal creditors were BT and Shintech: it owed approximately $4 million in secured debt to BT, and $3.5 million in unsecured debt to Shintech. No other creditor was owed more than $20,000.

### III. DISCUSSION

The Bankruptcy Code gives a trustee the power to avoid a variety of kinds of prepetition transactions. Such transactions include preferential payments to creditors (§ 547), fraudulent transfers (§ 548), the fixing of statutory liens (§ 545), and setoffs (§ 553). A debtor in possession in a chapter 11 case has all of the rights (except the right to compensation) and the powers of a trustee under chapter 11. This includes the right to

---

5. In consequence of giving up its security and its guaranties, Shintech now holds more than 99% of the unsecured debt in this case.

exercise the avoiding powers. Bankruptcy Code § 1107(a).[6]

■ However, the debtor is unable to use the fraudulent transfer provision of the Bankruptcy Code (§ 548) in this case, because it is only applicable to transfers made or obligations incurred on or within one year before the date of the filing of the petition. 11 U.S.C.A. § 548(a) (West 1993). Where state law provides a similar avoiding power to a creditor, on the other hand, Bankruptcy Code § 544(b)[7] permits a trustee (or a debtor in possession) to stand in the shoes of the creditor and to assert the same cause of action. *Kupetz v. Wolf*, 845 F.2d 842, 845 (9th Cir.1988). Trustees and debtors in possession routinely utilize this provision to make fraudulent transfer claims under applicable state law, which typically provides a statute of limitations of four to seven years. *See, e.g.*, Cal.Civ.Code § 3439.09 (West Supp. 1995). Thus the debtor has brought this adversary proceeding under § 544(b) and the UFTA as adopted in California.

## A. Fraudulent Transfer Law

■ The purpose of fraudulent transfer law is to prevent a debtor from transferring away valuable assets in exchange for less than adequate value, if the transfer leaves insufficient assets to compensate honest creditors. *See* 4 *Collier on Bankruptcy* ¶ 548.01 at 548–4 through 548–24 (Lawrence P. King ed., 15th ed. 1995); *Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 571 (Bankr.N.D.Cal.1994).

Modern fraudulent transfer law traces its origins to a statute of Elizabeth enacted in 1570. *See* 13 Eliz., ch. 5 (1570).[8] This statute provided that a conveyance made "to the End, Purpose and Intent to delay, hinder or defraud creditors" is voidable. *Id.,* § 1. Courts often relied on circumstantial "badges of fraud" to presume fraudulent intent. *See, e.g., Twyne's Case,* 76 Eng.Rep. 809, 810–14 (1601). The English law of fraudulent conveyance passed into the common law in the United States. This law was revised and codified by the National Conference of Commissioners on Uniform State Laws ("NCCUSL") in 1918, when it promulgated the Uniform Fraudulent Conveyance Act ("UFCA"). 7A U.L.A. 427, 428 (1985). The UFCA was adopted by California in 1939, and by a number of other states on various dates.

The NCCUSL rewrote the UFCA and promulgated it as the UFTA in 1984. *Id.,* at 639. California adopted its version of the UFTA, which is applicable in this case, in 1986. *See* Cal.Civ.Code §§ 3439–3439.12 (West Supp.1995) (applicable to transfers made after January 1, 1987). Bankruptcy Code § 548 contains a similar fraudulent transfer provision.[9] *See* 11 U.S.C.A. § 548 (West 1993).

## 1. The Species of Fraudulent Transfer

■ A transfer or conveyance is fraudulent if it is (1) an intentional fraudulent transfer, i.e., a transfer made with the intent to defeat, hinder or delay creditors; or (2) a transfer that is constructively fraudulent because the debtor is in financial distress. There are three kinds of financial distress that make a transaction a fraudulent trans-

---

**6.** 11 U.S.C.A. § 1107(a) (West 1993).

**7.** Section 544(b) provides:
The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. . . .
11 U.S.C.A. § 544(b) (West 1993).

**8.** This statute is frequently referred to erroneously as *the* Statute of Elizabeth. In those times statutes were known according to the monarch under whom they were enacted. Thus every statute enacted during the reign of Queen Eliza-

beth I was a "statute of Elizabeth." The fraudulent conveyance statute was enacted during the thirteenth year of her reign (hence "13 Eliz."), and was the fifth statute enacted that year (hence "ch. 5"). A bankruptcy statute, England's second, was enacted the same year, and is found at 13 Eliz. ch. 7 (1570).

**9.** The Bankruptcy Code and its predecessor the Bankruptcy Act of 1898 have traditionally included their own fraudulent transfer provisions, because a number of states did not adopt the UFCA, and some have not yet adopted the UFTA.

fer: (a) a transfer while a debtor is insolvent or that renders a debtor insolvent; (b) a transfer that leaves a debtor undercapitalized or nearly insolvent (i.e., with insufficient assets to carry on its business); (c) a transfer when the debtor intends to incur debts beyond its ability to pay. *See* UFTA §§ 4, 5; UFCA § 4; Bankruptcy Code § 548(a). Constructive fraudulent transfer law applies without regard to intent (except the intent to incur debts in the last alternative). *See, e.g., Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1063 (3d Cir.1992) (construing the UFCA).

In this adversary proceeding the debtor relies on the first two varieties of constructive fraudulent transfer, and is entitled to prevail if either cause of action is upheld. The Court addresses only the first (a transfer that renders the debtor insolvent), because it finds that the debtor is entitled to prevail on this cause of action.

## 2. Fraudulent Transfer Resulting in Insolvency

The UFTA, adopted in California effective for transactions after January 1, 1987, provides in relevant part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became

insolvent as a result of the transfer or obligation.

Cal.Civ.Code § 3439.05 (West Supp.1995).[10]

## 3. Application of Fraudulent Transfer Law to LBOs

### a. General

The basic structure of an LBO involves a transfer of corporate ownership financed primarily by the assets of the corporation itself.[11] Typically the corporation borrows the funds, secured by the assets of the corporation, and advances them to the purchasers, who use the funds to pay the purchase price to the selling shareholders. Kathryn V. Smyser, *Going Private and Going Under: Leveraged Buyouts and the Fraudulent Conveyance Problem,* 63 Ind.L.J. 781, 784–85 (1988). LBOs have two essential features:

First, the purchaser acquires the funds necessary for the acquisition through borrowings secured directly or indirectly by the assets of the company being acquired. Second, the lender who provides such funds is looking primarily to the future operating earnings of the acquired company and/or to the proceeds from future sales of assets of the company, rather than to any other assets of the purchasers, to repay the borrowings used to effect the acquisition.

*Id.,* at 785. LBO investors thus generally consider cash flow, the money available for working capital and debt service, as the most important factor in assessing a potential buyout candidate. *Id.,* at 785 n. 12.

The application of fraudulent transfer law to LBOs has generated considerable debate among courts and commentators.[12] LBOs

---

**10.** These provisions are identical to the corresponding parts of UFTA § 5(a). 7A U.L.A. 652 (1985).

**11.** While LBOs have frequently been used by management to buy out existing shareholders and take over the ownership of a business, management is not an essential party to an LBO. Indeed, in this case the purchaser was an outside third party.

**12.** *See, e.g.,* 4 James F. Queenan, Jr. et al., *Chapter 11 Theory and Practice: A Guide to Reorganization* ch. 27 (1994); 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice* ch. 58A (2d

ed. 1994); David Weinstein, *From Kupetz to Lippi and Beyond: LBOs in the Ninth Circuit—Now What?,* 21 Cal.Bankr.J. 169, (1993); 2 David G. Epstein et al., *Bankruptcy* § 6–52 (1992); Emily L. Sherwin, *Creditors' Rights Against Participants in a Leveraged Buyout,* 72 Minn.L.Rev. 449 (1988); Kathryn V. Smyser, *Going Private and Going Under: Leveraged Buyouts and the Fraudulent Conveyance Problem,* 63 Ind.L.J. 781, 784–85 (1988); Kevin J. Liss, Note, *Fraudulent Conveyance Law and Leveraged Buyouts,* 87 Colum.L.Rev. 1491 (1987); Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain,* 38 Vand.L.Rev. 829, 850–54 (1985).

were a popular form of consensual corporate takeover in the 1980's. They fell into disuse at the end of that decade for economic reasons. However, the use of the LBO as an acquisition device has recently become popular again. *See* Laura Jereski, 'Recaps' Are Secret Fuel for Leveraged Buyouts, Wall St.J., July 25, 1995, at C1.

The LBO dates back long before the 1980's. In earlier years, it was known as a "bootstrap acquisition." Some of these transactions were invalidated as fraudulent conveyances. *See Steph v. Branch,* 255 F.Supp. 526 (E.D.Okla.), *aff'd,* 389 F.2d 233 (10th Cir.1968); *In re Process Manz Press,* 236 F.Supp. 333 (N.D.Ill.1964), *rev'd on juris. grounds* 369 F.2d 513 (7th Cir.1966), *cert. denied,* 386 U.S. 957, 87 S.Ct. 1022, 18 L.Ed.2d 104 (1967); *Diller v. Irving Trust Co. (In re College Chemists, Inc.),* 62 F.2d 1058 (2d Cir.1933); Smyser, supra note 12, at 788 & n. 21.

### b. Ninth Circuit Case Law

The Ninth Circuit has had difficulties with the application of fraudulent transfer law to LBOs.[13] The Ninth Circuit case law is found in two opinions, *Lippi v. City Bank,* 955 F.2d 599 (9th Cir.1992), which arose under Hawaii common law, and *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988), which arose under the California version of the UFCA. The applicability of these precedents is complicated by the fact that each was based on a statute different from the California version of the UFTA involved in this case.

#### i. *Lippi*

*Lippi* involved the bankruptcy of Pacific Industrial Distributors, Inc. ("PID"), which originally was owned by three shareholders. At a time when the balance sheet showed that the stockholders' equity was $195,450, one of the shareholders bought out the other two for $500,000. Half of the financing was unexceptional: (1) the purchasing shareholder personally paid only $12,500 of the purchase price; (2) he, his holding corporation and his family borrowed $137,500 on an unsecured basis; (3) the selling shareholders financed $100,000, secured by a security interest in the stock.

The remaining half of the financing created the problem. In substance the remaining $250,000 of the financing came from a Small Business Administration loan (through City Bank) to PID, which was secured by a security interest in all of PID's assets. PID upstreamed the funds to the holding company to pay to the selling shareholders.

Although PID was directly liable for only $250,000 of the funds used to buy out the selling shareholders, in fact it paid out $667,000 in payments to City Bank and in dividends to the holding company to repay the entire purchase price (including the $12,500 paid by the purchasing shareholder). While all of the creditors who had lent money for the buyout had been paid in full, PID was left with unsecured debts of $485,000 at the time that the involuntary bankruptcy case was filed more than three years later.

Subsequent creditors challenged the LBO in *Lippi* pursuant to the Hawaiian common law of fraudulent conveyance,[14] which permitted subsequent creditors to attack a conveyance (a) that was made with intent to defraud creditors, (b) that was secret or concealed, or

---

**13.** The Third Circuit views LBOs somewhat less skeptically than the Ninth. In *Moody v. Security Pacific Business Credit, Inc.,* the court stated that, while LBO's are attractive to both the buyer and the seller, "failed LBO's merit close scrutiny under the fraudulent conveyance laws," because they have shifted the risk of loss to creditors. *Moody,* 971 F.2d 1056, 1073 (3d Cir.1992). In *Mellon Bank v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir.1991), the court stated:

> [A] thorough understanding of the typical LBO transaction reveals that there is a potential for abuse of the debtor's creditors, particularly those who are unsecured, when a company is purchased through an LBO.

*Id.,* at 645. The court found in both *Moody* and *Mellon Bank* that the LBO at issue survived fraudulent transfer scrutiny. However, in *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), the Third Circuit upheld a trial court's determination that an LBO was a fraudulent transfer.

**14.** Hawaii never adopted the UFCA. Like California, it adopted the UFTA in 1985. However, the *Lippi* facts arose in 1981, before the UFTA was enacted. *Id.* at 602.

(c) that was made with the intent to engage in a new or hazardous business, the risk of which would be placed on subsequent creditors. *Lippi*, at 607, citing *Metzger v. Lalakea*, 32 Haw. 706 (1933).

The defendants challenged the standing of the trustee, who represented only post-transaction creditors, to bring the action against them, on the grounds that they had no intent to defraud existing or future creditors of PID. The Ninth Circuit had "no quarrel" with the district court's limitation of the right of future creditors to challenge an LBO to cases where there was an actual intent to defraud or to conceal the transaction from public scrutiny. *Lippi*, at 606. The court found this consistent with Hawaii law, even though it omitted the third ground for attacking a fraudulent transfer, that the debtor intended to engage in a new and hazardous business, the risk of which would be placed on subsequent creditors.

The circuit court found that the district court erred, however, in making a defendant-by-defendant analysis of intent. The circuit court held that this determination must be based on the nature of the transaction:

> Thus, the issue is whether future creditors were somehow precluded by actual fraud or concealment from discovering the nature of the *transaction* and the company's financial status at the time of their advances. Whether every defendant or transferee is in on the fraud or concealment is irrelevant.

*Id.* at 607 (emphasis in original). Because the trial court had found a triable issue of fact as to the intent of the purchasing shareholder, the circuit court found that summary judgment on standing as to the remaining defendants was improper.

■ In *Lippi* the circuit court also reversed the trial court's finding that the selling shareholders were within the safe harbor of Bankruptcy Code § 550(b)(1),[15] and thus entitled to keep the funds that they had received. Section 550(b)(1) protects third parties who receive transfers from the initial transferee of a fraudulent transfer.[16] The shareholders in *Lippi* contended that they were "immediate transferees" of the "initial transferee", the holding company established by the purchasing shareholder, and thus eligible to invoke the protection of the safe harbor provision.

The circuit court found that the selling shareholders in *Lippi* were not in substance initial transferees of the funds. It found that the funds were not transferred to the holding company "for the benefit" of these shareholders, as provided in § 550(a), because the funds were not passed on to them immediately. *Id.* at 611, citing *In re Bullion Reserve of North America*, 922 F.2d 544, 548–49 (9th Cir.1991). The court also found that the holding company did not act merely as a conduit, because it exercised full dominion and control over the dividends that it received before passing them on.

However, the circuit court found that the *Lippi* defendants had not shown that they satisfied the "good faith" requirement for the § 550(b)(1) safe harbor, and reversed and remanded on these grounds. The court held that, if the selling shareholders did not receive their transfers in good faith in an "above board" transaction, the transaction

---

**15.** Section 550(b) provides in relevant part:

> The trustee may not recover under section (a)(2) of this section from—
> (1) a transferee that takes for value, ... in good faith, and without knowledge of the voidability of the transfer avoided....

11 U.S.C.A. § 550(b) (West 1993). Section 550(a) provides in relevant part:

> [T]o the extent that a transfer is avoided under section 544 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C.A. § 550(a) (West 1993).

**16.** The language of § 550 is difficult to parse. It contemplates that property subject to an avoidance action and recovery by the trustee may be transferred several times before the trustee catches up with it. The first to receive the property is the "initial transferee"; the second is the "immediate transferee" of the initial transferee; a subsequent transferee is a "mediate transferee".

may be collapsed and they may be treated as initial transferees ineligible for the safe harbor. *Id.*, at 611–12; *accord, United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302–03 (3d Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 500 (N.D.Ill.1988). This inquiry involves a consideration of the knowledge and intent of the selling shareholders, which must be undertaken on a case by case basis. *Lippi*, at 611–12.

The circuit court in *Lippi* found no direct evidence that the selling shareholders knew of any intent to defraud the debtor, knew that the buyout was leveraged, knew that the debtor was the borrower on the loan or were aware that they were to be paid from any source other than surplus of the debtor. *Id.* at 613. However, it found that they knew or should have known that the debtor was undercapitalized, that other entities controlled by the purchasing shareholder were in arrearage in payments to the debtor, that the debtor could legally only purchase its shares out of surplus, and that there was insufficient surplus to pay the purchase price. *Id.* It also found that the trial court had given inadequate consideration to what the selling shareholders should have known as corporate directors and officers who owed fiduciary duties to the corporation. *Id.*[17]

The court in *Lippi* found that it should respect the formal structure of the transaction only where it appeared to be a straight sale, in the eyes of the defendants. *Id.* at 612. On the other hand, if the selling shareholders either knew or should have known that the transaction would deplete the assets of the company, the court should collapse the interrelated transactions and look to the substance rather than the form. *Id.*, citing *Tabor Court Realty*, 803 F.2d at 1302–03, and *Wieboldt Stores*, 94 B.R. at 500.

In *Lippi* the Ninth Circuit found conflicting evidence on whether the selling shareholders had knowledge of or reason to know of the leveraged character of the transaction. For this reason it reversed the summary judgment in favor of the selling shareholders. *Lippi*, at 613–14. The court let summary

judgment stand, however, as to other defendants who undisputedly had no knowledge of or reason to know of the LBO feature of the transaction.

### ii. *Kuptez*

*Kupetz* was a lawsuit by the trustee against the prior owners of Wolf & Vine, Inc., a corporation whose new shareholder had purchased the stock in an LBO. The purchaser formed a holding company to acquire the stock, partially in cash and partially with payments secured by letters of credit issued by Continental Illinois National Bank. The letters of credit in turn were secured by the assets of Wolf & Vine (as well as other assets). However, the selling shareholders did not know of the LBO character of the sale.

Because there were no pre-sale creditors in the ensuing corporate bankruptcy case, the trustee challenged the transaction as a constructive fraudulent transfer under § 5 of the UFCA, which provides:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

California Civil Code § 3439.05 (repealed 1986). The trial court was particularly troubled by the application of constructive fraudulent conveyance law to this transaction for several reasons: there were no remaining pre-transaction creditors, the business was prosperous at the time of the sale, the purchaser was wealthy and well-connected with a major financial institution, and the sellers had no knowledge of the LBO feature of the transaction. *Kupetz v. Continental Illinois National Bank & Trust Co.*, 77 B.R. 754, 760 (C.D.Cal.1987), *aff'd*, 845 F.2d 842 (9th Cir. 1989). In consequence, the trial court held

---

**17.** *See also* Sherwin, supra note 12, at 518.

that § 5 could not be extended to the facts of this case.

The Ninth Circuit affirmed.[18] However, its reasoning is difficult to understand, and has been strongly criticized. *See* David R. Weinstein, *From Kupetz to Lippi and Beyond: LBOs in the Ninth Circuit—Now What?*, 21 Cal.Bankr.J. 169 (1993). In *Lippi*, however, the Ninth Circuit gave its authoritative interpretation of *Kupetz*, and mostly clarified the analytic difficulties.

 In this interpretation, *Kupetz* established two propositions. First, subsequent creditors (and a bankruptcy trustee standing in the shoes of subsequent creditors) lack standing to challenge an LBO if it has been widely publicized at the time, absent actual intent to defraud. *Lippi*, 955 F.2d at 606–07. Second, an LBO transaction should not be collapsed for the benefit of subsequent creditors to deny the selling shareholders the safe harbor of § 550(b)(1) if the following four factors are present: (a) there is no evidence that the selling shareholders intended to defraud creditors; (b) the selling shareholders did not know that the purchaser intended to finance the purchase through an LBO; (c) there were no pre-transaction creditors; (d) the form of the transaction reflects a sale to an entity other than the issuer of the stock.[19] *Id.*, at 612, quoting *Kupetz*, 845 F.2d at 847–48.

### iii. *Richmond Produce*

There is one reported LBO case in the Ninth Circuit after *Lippi*, *Kendall v. Sorani (In re Richmond Produce Co.)*, 151 B.R. 1012 (Bankr.N.D.Cal.1993), a decision by Judge Leslie Tchaikowski in the Northern District of California. The trustee prevailed in an attack on the LBO as a fraudulent transfer under Bankruptcy Code § 548,[20] the Bankruptcy Code analogue to UFTA § 4.

In *Richmond Produce*, Mechanics Bank lent $1.5 million to the debtor corporation, and took a security interest in all of its assets. The debtor used these funds to purchase a certificate of deposit at Bank of California ("BanCal"), which had issued a $1.5 million standby letter of credit as security for a portion of the purchase price of shares bought by the new shareholders. The certificate of deposit was used to secure the letter of credit. When the debtor eventually defaulted in paying property taxes, which was a default under the security agreement for the unpaid purchase price for the shares of stock, the selling shareholders called the letter of credit, and BanCal enforced its security interest in the certificate of deposit. In consequence, the selling shareholders and BanCal were paid. The trustee in *Richmond Produce* sued BanCal for the proceeds of the certificate of deposit.

In determining solvency, the court held that goodwill must be disregarded, even though it was calculated in a manner consistent with generally accepted accounting principles, because it could not be sold to satisfy creditors' claims. *Id.*, at 1019. In addition, the court found extremely persuasive the fact that goodwill and organization expenses must be disregarded in a solvency determination for the purpose of determining whether a corporation may make a shareholder distribution. California Corporations Code § 500(b)(1) (West Supp.1995). After this adjustment, the court found that the LBO rendered the debtor insolvent.

The court found that BanCal was a second level transferee (immediate transferee of the initial transferee), and thus could assert a § 550(b)(1) defense. This required that the bank show that it gave value for the transfer,

---

**18.** After prevailing in the Ninth Circuit, the Wolfs (but not the other shareholder) filed a malicious prosecution action against the chapter 7 trustee, his law firm, his attorneys and the financing bank. This Court granted summary judgment to all defendants, and granted substantial sanctions in their favor. *See Wolf v. Kupetz (In re Wolf & Vine, Inc.)*, 118 B.R. 761 (Bankr.C.D.Cal.1990).

**19.** In fact, *Kupetz* was a very narrow case: the Ninth Circuit itself stated in that case, "we should not be understood as insulating all LBOs from fraudulent conveyance laws...." *Kupetz*, 845 F.2d at 850.

**20.** 11 U.S.C.A. § 548 (West 1993). It is noteworthy that the court in *Richmond Produce* hardly mentioned *Lippi* and *Kupetz*: it referred to these cases only in footnotes, and then only to clarify their nonapplicability.

in good faith, and without knowledge of the voidability of the transaction. The court found that BanCal gave value in good faith. However, the court found that BanCal knew sufficient suspicious facts to obligate it to inquire into the source of the funds that were used to purchase the certificate of deposit. This inquiry requirement defeated its § 550(b)(1) defense.

## B. Trustee's Prima Facie Case

■ After having explored the applicable statutes and governing case law, the Court is now in position to apply this law to the facts of the instant case.

The Court notes at the outset that this case is not determined by the Ninth Circuit case law as set forth in the *Lippi* and *Kupetz* cases. Those cases both involved a fraudulent transfer attack on behalf of subsequent creditors. This case, in contrast, is brought for the principal benefit of a creditor existing at the time of the transaction, which holds more than 99% of the outstanding unsecured debt.

We begin with the elements of the cause of action under the UFTA § 5, as adopted in California, for a constructive fraudulent transfer rendering the debtor insolvent. The elements of a cause of action under this statute are as follows: the debtor (1) made a transfer or incurred an obligation, (2) without receiving a reasonably equivalent value in exchange,[21] (3) which rendered the debtor

insolvent (or the debtor was already insolvent),[22] and (4) which is attacked by a pre-transaction creditor.

### 1. Transfer or Obligation

The selling shareholders do not dispute that, in making the BT loan, the debtor made a transfer or incurred an obligation. In fact, the debtor did both. The debtor undertook the $3.95 million obligation to BT, it transferred a security interest in essentially all of its assets to BT, and it transferred $3.5 million ultimately to the selling shareholders. Thus the first element of the cause of action is satisfied.

### 2. Lack of Reasonably Equivalent Value

The selling shareholders likewise do not contest whether the debtor received reasonably equivalent value for the BT loan. However, this element is not apparent on its face.

Nominally, BT's transaction was only with Bay Plastics. It lent the $3.95 million *to the debtor*, the debtor promised to repay the loan, and the debtor gave a first priority security interest in essentially all of its assets to secure the repayment. If this were the transaction, creditors likely would have no grounds for complaint, and it would not be vulnerable to fraudulent transfer attack.

However, the foregoing structure obscures the reality of the transaction. The selling

---

21. In contrast, the UFCA makes a transfer fraudulent if it was made "without a fair consideration." UFCA § 4, 7A U.L.A. 474 (1985). "Fair consideration" is a defined term in the UFCA: § 3 provides:

> Fair consideration is given for property, or obligation:
> (a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

UFCA § 3, 7A U.L.A. 448–49 (1985). The UFCA has no definition for "reasonably equivalent value."

Apart from this difference, the elements of a cause of action under the two statutes are the same. The elements of a cause of action for a fraudulent transfer rendering a debtor insolvent

under Bankruptcy Code § 548 are the same as under the UFTA.

22. The definitions of insolvency under the various fraudulent transfer statutes differ. The UFCA adopts the "equity" or "cash flow" test of insolvency, under which a debtor is insolvent if the present fair salable value of the debtor's assets is less than the amount required to pay existing debts as they become due. UFCA § 2(a). The Bankruptcy Code § 101(32)(A) adopts the balance sheet definition of insolvency, under which a debtor is insolvent if the debtor's liabilities exceed the debtor's assets. 11 U.S.C.A. § 101(32)(A) (West 1993). Under the UFTA, a debtor is insolvent if the debtor's liabilities exceed the debtor's assets (the balance sheet definition), and the debtor is presumed to be insolvent if the debtor is generally not paying his or her debts as they become due (the equity or cash flow test). UFTA § 2(a), (c).

shareholders' transaction was formally with Milhous, and eventually with BPI, the new owner of Bay Plastics. BPI purchased their stock, and arranged for their payment with funds that Bay Plastics borrowed from BT. Before Bay Plastics received the funds, it directed that $3.5 million be transferred to its incoming parent, BPI, and BPI in turn directed that the funds be paid out for the stock purchase. Thus in substance $3.5 million of the funds that Bay Plastics borrowed from BT went to pay for the stock of the selling shareholders, rather than to Bay Plastics.

■ This raises the question whether the Court should collapse the various transactions in this case into one integrated transaction. Under *Lippi* this turns on whether, from the perspective of the selling shareholders, the transaction appeared to be a straight sale without an LBO. *Lippi*, 955 F.2d at 612. If, in contrast, there is evidence that the parties knew or should have known that the transaction would deplete the assets of the company, the Court should look beyond the formal structure. *Id.* In *Kupetz* the Ninth Circuit found it improper to collapse the transactions where the selling shareholders had no knowledge of the LBO character of the transaction, and there were no pre-transaction creditors.

In this case, in contrast, the selling shareholders had full knowledge that this was an LBO. The Milhous representatives informed them of this at the October 25 meeting before the transaction was finalized, and it was disclosed in the financial projections provided at that time. In addition, the selling shareholders discussed this feature with their legal counsel on October 25, and specifically discussed their exposure to a fraudulent transfer claim. Both the selling shareholders and their legal counsel were familiar with leveraged buyouts, because they had done others previously, and they knew the fraudulent transfer risks.

This knowledge of the selling shareholders distinguishes this case from both *Kupetz* (where the selling shareholders did not know or have reason to know of the LBO) and from *Lippi* (where the evidence was disputed). Instead, this case is like *Richmond Produce, Wieboldt* and *Tabor Court Realty*, where the transaction was collapsed because of the knowledge of the selling shareholders.

In addition, because Shintech qualifies as a pre-transaction creditor, the Court does not need to reach the issue of the knowledge of the LBO feature of the transaction by the selling shareholders: this is material to whether the transaction's various parts should be collapsed only when challenged by post-transaction creditors.

Thus, in this case the Court finds it appropriate to collapse the various pieces of this transaction into one integral transaction, in which the funds went to the selling shareholders, not to Bay Plastics or to its new parent BPI. The loan obligation, in contrast, was undertaken by Bay Plastics, which also provided the security for the loan.

■ Bay Plastics received no reasonably equivalent value for the security interest in all of its assets that it gave to BT in exchange for BT's funding of the stock sale. Under California law, reasonable equivalence must be determined from the standpoint of creditors. *Hansen v. Cramer*, 39 Cal.2d 321, 245 P.2d 1059, 1061 (1952) (applying rule to "fair consideration" under predecessor statute); *Patterson v. Missler*, 238 Cal.App.2d 759, 48 Cal.Rptr. 215, 221 (1965) (same). The Ninth Circuit has adopted the same view in interpreting the California version of the UFTA. *Roosevelt v. Ray (In re Roosevelt)*, 176 B.R. 200 (9th Cir. BAP 1994); *Maddox v. Robertson (In re Prejean)*, 994 F.2d 706, 708 (9th Cir.1993); *accord, Mellon Bank v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir.1991); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir.1987); *Pajaro Dunes Rental Agency v. Spitters (In re Pajaro Dunes Rental Agency)*, 174 B.R. 557, 578 (Bankr.N.D.Cal.1994); *In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr.N.D.Tex.1992). Payment of funds to a parent corporation prevents a transaction from satisfying the "reasonably equivalent value" requirement. *Pajaro Dunes, supra*, at 579. A financially healthy entity may give away its assets as it pleases so long as there remains enough to pay its debts. A financially distressed donor, how-

ever, may not be so generous. Weinstein, supra note 12, at 176.

From the debtor's perspective, it is apparent that the $450,000 that Bay Plastics presumably received[23] (the $3.95 million loan less the $3.5 million paid to the selling shareholders) is not reasonably equivalent to the $3.95 million obligation that it undertook. *Cf. Shape, Inc. v. Midwest Engineering (In re Shape, Inc.)*, 176 B.R. 1, 3 (Bankr.D.Me. 1994) (payment of $70,000 for stock worth more than $1.5 million lacks reasonably equivalent value). Thus Bay Plastics did not receive reasonably equivalent value for the loan obligation and security interest that it granted to BT.

### 3. Insolvency of the Debtor

■ The third element of the fraudulent transfer cause of action at issue in this litigation is that the transaction rendered the debtor insolvent, if it was not so already. In this case the Court finds the evidence undisputed that the LBO rendered the debtor insolvent.

Insolvency is defined in California Civil Code § 3439.02(a) (West Supp.1995): "A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." UFTA § 2(a) is essentially the same. These statutes adopt the balance sheet test for insolvency: a debtor is insolvent if the liabilities exceed the assets.

■ The usual starting point for determining the sufficiency of assets is the balance sheet, particularly if the balance sheet is prepared according to generally accepted accounting principles consistently applied. *See Kendall v. Sorani (In re Richmond Produce Co.)*, 151 B.R. 1012, 1019 (Bankr.N.D.Cal. 1993); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 437–39 (Bankr.N.D.Ohio 1988). However, these principles do not control a court's decision regarding the solvency of an entity. *Richmond Produce*, 151 B.R. at 1019; *Ohio Corrugating*, 91 B.R. at 437–39; *Foley v. Briden (In re Arrowhead Gardens, Inc.)*, 32 B.R. 296 (Bankr.D.Mass.1983).

■ The valuation of assets for insolvency purposes is based on "a fair valuation." This differs from a balance sheet, where most assets apart from publicly traded stocks and bonds are carried at historic cost, rather than current market value. The values of assets must be updated in light of subsequent use and market conditions: in accounting parlance, they must be "marked to market."

■ In addition, a balance sheet may include intangible assets such as goodwill[24] that may have no liquidation or going concern value, and which thus must be deleted in evaluating the solvency of an entity. Goodwill cannot be sold to satisfy a creditor's claim. Thus, in a liquidation bankruptcy case it must be disregarded in determining solvency of the debtor at the time of an LBO. *Richmond Produce*, 151 B.R. at 1019.

Nominally, Bay Plastic's corporate balance sheet showed the debtor to be solvent after the LBO. But this resulted only from the addition of $2.26 million of goodwill to the asset side of the balance sheet. Bay Plastics had not previously carried any goodwill on its balance sheets.

---

**23.** The record is silent on this point.

**24.** Goodwill is generally understood to represent the value of intangible factors that are expected to translate into greater than normal earning power. In addition to the advantageous relationship that a business enjoys with its customers, goodwill also includes advantageous relationships with employees, suppliers, lenders and others. Commons, *Industrial Goodwill* 18–26 (1919); *see, also, Grace Bros. v. Commissioner*, 173 F.2d 170 (9th Cir.1949); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 135 (Bankr.D.Mass. 1989).

Because goodwill has no independent market or liquidation value, generally accepted accounting principles require that goodwill be written off over a period of time. In acquisition accounting, going concern value in excess of asset value is treated as goodwill. *Dictionary of Finance & Investment Terms* 157 (2d ed. 1987).

Goodwill frequently appears on a balance sheet after the sale of a business, where it represents the excess of the purchase price over the net value of the other assets purchased. *See, e.g., Richmond Produce*, 151 B.R. at 1019. It appears that this may be the explanation for the appearance of goodwill on the debtor's balance sheet in this case.

The parties to this litigation have accepted the debtor's balance sheet immediately after the LBO as a fair presentation of the debtor's financial status, with the exception of goodwill. Thus the Court is relieved of the burden of marking to market the debtor's assets. However, the trustee contends that the goodwill of $2.26 million that first appeared at that time must be deleted in determining the debtor's solvency.

The Court finds that the balance sheet must be adjusted by deleting the unamortized goodwill of $2.26 million. It was not carried on the balance sheet before the LBO, and in any case it could not be sold to satisfy a creditor's claim. *Richmond Produce,* 151 B.R. at 1019. This is a liquidation case, where goodwill has no other value. This downward adjustment left Bay Plastics with a negative net worth of approximately $2 million immediately after the LBO. For fraudulent transfer purposes, it was rendered insolvent by the transaction.

Indeed, this is exactly the type of transaction that poses the extreme risk of an LBO. No Milhous entity put any funds or assets at risk in the investment at all. In consequence of the structure of the transaction, all of the risks of the enterprise were placed on its creditors. Milhous retained only the right to reap the benefits if the business was sufficiently profitable to avoid bankruptcy.[25]

### 4. Attack by a Pre–Transaction Creditor

■ The final element of the cause of action for fraudulent transfer rendering a debtor insolvent is that the transaction must be attacked by a pre-transaction creditor.[26] This element is satisfied in this case.

Shintech, the principal unsecured creditor in this case, which holds more than 99% of the unsecured debt, is the pre-existing creditor. It was secured until this transaction, and in addition it held guaranties from each of the selling shareholders. In this transaction the selling shareholders and Milhous induced it to relinquish its security and guaranties to permit the transaction to be consummated. Although knowing the LBO character of the transaction, both the selling shareholders and Milhous failed to disclose this feature to Shintech.

The selling shareholders make three arguments against considering Shintech a qualifying pre-transaction creditor. First, they argue that Shintech's account was current at the time of the LBO, and that in consequence all of its debt comes from a later date. Second, they argue that Shintech had an opportunity at the pre-closing meeting, where it agreed to release its security interest and guaranties, to ask any questions that it wanted, and it declared that it was satisfied with the information provided to it. Third, they claim that Nicole Plastic's purchase of Shintech's claim in settlement of a lawsuit by Shintech against Nicole and other Milhouse entities disqualifies this claim as a pre-transaction claim: in effect, the shareholders contend, the claim now belongs to the debtor itself. The Court finds all of these arguments unpersuasive.

#### a. Shintech as Creditor

■ First, the Court finds that Shintech is a pre-transaction creditor of Bay Plastics, even if the account was current at the time of the LBO. Just three months earlier Shintech had entered into a massive contract with Bay Plastics to provide all of its requirements of PVC, which were monumental—up to 2.6 million pounds (1300 tons) per month. Under this contract Bay Plastics owed a duty to Shintech to buy its PVC from Shintech for the duration of the contract, whether or not

---

**25.** In such a transaction there is a danger that the selling shareholders will be paid more than their stock is worth. With nothing at risk if the business is not sufficiently profitable, the purchaser has less incentive to make sure that the price is not excessive. Absent fraudulent transfer law, there is nothing to deter the buyers, sellers and bank from imposing all of the risks of loss on the creditors, as they did in this case.

**26.** While the existence of a pre-transaction creditor is an element in the cause of action involved in this case, it was not an element in the causes of action involved in the *Lippi* and *Kupetz* cases. The Ninth Circuit treated this as a question of "standing" in those cases. *Lippi,* 955 F.2d at 606–08; *Kupetz,* 845 F.2d at 849 n. 16. It is not clear why it was an issue at all in those cases. *See* Weinstein, supra note 12, at 192.

the account was current on any particular day. The contract was in place on the day of the LBO, and remained in force until after the bankruptcy filing.

UFTA § 5 and California Civil Code § 3439.05 require a "creditor whose claim arose before . . . the obligation was incurred" to permit the court to set aside a transfer resulting in insolvency. UFTA § 1(c) and California Civil Code § 3439.01(c) define a "creditor" as "a person who has a claim." "Claim" is defined expansively in UFTA § 1(b) and California Civil Code § 3439.01(b) as follows:

> a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

Shintech's contract rights under its requirements contract to provide PVC were certainly not valueless, even if payments were current at the time of the LBO. If Bay Plastics had repudiated the contract on the day after the LBO, it would have owed massive damages to Shintech. If Bay Plastics had filed a bankruptcy case on that date and rejected the contract thereafter under Bankruptcy Code § 365, Shintech would have been entitled to an unsecured claim in the bankruptcy case. Bankruptcy Code § 364(g)(1).[27] The Court finds that this right satisfied the definitional requirements to make it a creditor holding a claim, as defined in UFTA § 1(b) and California Civil Code § 3439.01(b).

In *Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 888–91 (Bankr.N.D.Ill. 1991), the court found that a complaint sufficiently alleged the existence of pre-transaction creditors where it claimed that there were agreements for open trade accounts in place at the time of the LBO and continuing until the bankruptcy was filed.[28] In this case there was more than an open account with Shintech: there was a massive requirements contract for all of the PVC that Bay Plastics needed.

The Court holds that this made Shintech a creditor of Bay Plastics at that time, and that Shintech maintained this status until the bankruptcy case was filed. Thus this element of the cause of action is met.

### b. Investigation of the Transaction

■ Second, the selling shareholders argue that Shintech, the largest supplier of PVC resin in the industry, had every opportunity to investigate the nature of the LBO transaction, and cannot now be heard to complain about it. The Court finds this is irrelevant to the cause of action for a fraudulent transfer that renders a debtor insolvent.

■ Furthermore, at best, this evidence only shows that one supplier in the PVC pipe industry failed to discover the LBO. It does not establish, as required by *Kupetz*, that the entire industry knew or had reason to know that the stock purchase was a LBO. *Kupetz*, 845 F.2d at 849.

The shareholders assert that the sale notice sent to 25 suppliers of the debtor (presumably a bulk sale notice under UCC article 6) gave sufficient notice of the LBO. This notice, however, did not state that the transaction was an LBO or that the transaction would render the debtor insolvent. Furthermore, a public LBO only puts *subsequent* creditors on notice of possible financial problems. They may decide not to do business with the debtor, and avoid becoming creditors.[29] Existing creditors, on the other hand,

---

27. 11 U.S.C.A. § 365(g)(1) (West 1993) provides:
 [T]he rejection of an executory contract . . . of the debtor constitutes a breach of such contract . . .—
 (1) . . . immediately before the date of the filing of the petition. . . .

28. *Cf. Unsecured Creditors' Committee v. Banque Paribas (In re Heartland Chemicals, Inc.)*, 103 B.R. 1012, 1016 (Bankr.C.D.Ill.1989) (creditor does not qualify as a pre-transaction creditor if the indebtedness was paid off after the transaction and then extended new credit).

29. The Court notes that this analysis only applies to *voluntary* creditors, such as those at issue in *Kupetz* and in this case. Involuntary creditors, on the other hand, such as tort claimants and taxing authorities, are generally no better able to avoid becoming creditors even if they know of an LBO, and the *Kupetz* analysis should not apply to them.

are already locked in, and subsequent notice does not do them any good.

■ Thus, the LBO acquisition of the debtor was a secret transaction in the PVC pipe industry. Fraudulent transfer law was designed from the outset (in 1570) to protect creditors from secret transactions. *Kupetz,* 845 F.2d at 849–50 n. 16. Indeed, the evidence is undisputed that the LBO feature of the purchase did not become well known in the industry until after the debtor filed its bankruptcy petition.

Shintech did change its position at the time of the transaction, in giving up its security and its guaranties. It apparently could have prevented the transaction from going forward if it had refused to make these concessions. However, the LBO feature of the transaction was hidden from it. Thus, the transaction was a secret transaction as to both Shintech and the industry, of the sort that the Ninth Circuit in *Kupetz* declared to be within the scope of a fraudulent transfer claim, even if brought only on behalf of subsequent creditors.

### c. Settlement

■ Third, the Court finds that the Nicole Plastic's purchase of Shintech's claim in its settlement of Shintech's lawsuit against various Milhous entities does not moot Shintech's pre-LBO claim. Nicole Plastic's purchase of Shintech's claim does not eliminate the claim. While the selling shareholders contend that in effect Bay Plastics now owns this claim, this is not so. Nicole Plastics is a different entity, and not the debtor or the trustee. The claim is still pending against the Bay Plastics estate. It does not belong to the debtor, but to its parent corporation, which is a separate entity. Most important, the claim is clearly adverse to the selling shareholders. It thus continues to support the debtor's fraudulent transfer claim against the selling shareholders.

### C. Application of Fraudulent Transfer Law to LBOs

■ The Court finds it appropriate to apply fraudulent transfer law to an LBO.

An LBO is different, not just in degree, but in character from the ordinary business and investment transactions engaged in by a corporation's management. An LBO is not a routine business transaction that should normally be given deference by the courts. It is not a corporate investment in a new venture, new equipment or property. Indeed, an LBO normally does not affect the business of the corporation at all: it only changes the ownership and adds a large layer of secured debt. Rather, an LBO is an investment of corporate assets, by borrowing against them, for the *personal* benefit of both old and new equity owners. Thus, the application of fraudulent transfer law to LBOs does not limit corporate entrepreneurial decisions.

Since an LBO reduces the availability of unencumbered assets, the buyout depletes estate assets available to pay creditors' claims. As the Ninth Circuit has stated:

> Existing unsecured creditors are vulnerable in [an LBO]. From their perspective, a pledge of the company's assets as collateral to finance the purchase of the company reduces the assets to which they can look for repayment.

*Kupetz,* 845 F.2d at 846; *accord, Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1073 (3d Cir.1992). An LBO is attractive to the sellers, the buyers and the lender because it shifts most of the risk of loss to other creditors of the corporation. *Mellon Bank v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir.1991). The acquired corporation receives little or nothing in exchange for the debt that it incurs.

From a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders. The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional kinds of fraudulent transfers.[30] If the value of the security interest given by the corporation does not exceed the shareholders' equity as shown on the balance sheet (after suitable revisions to mark the assets to market and to eliminate intangible assets of dubious value), there is usually no

---

**30.** David Epstein and his co-authors state: "[The creditors] are harmed just as much as if the debtor had given away the equity in its assets as a gift." Epstein, *supra* note 12, § 6–52 at 69.

substantial harm to creditors. Indeed, typical corporate distribution statutes permit the payment of dividends in such circumstances, to the extent of the balance sheet equity. *See, e.g.,* Cal.Corp.Code § 166 (West Supp. 1995). If the price paid to selling shareholders is higher, however, there may be insufficient assets remaining to satisfy creditors.

The vice of an LBO lies in the fact that the selling shareholders are paid indirectly with assets from the corporation itself, rather than by the purchasers. In effect, in an LBO the shareholders are paid with a corporate dividend or distribution. An LBO enables the selling shareholders to liquidate their equity interests, which are otherwise subordinate to general unsecured claims, without first paying creditors, which a normal liquidation would require. The selling shareholders in the transaction in effect disregard the status of the corporation as a separate entity for their benefit, but insist on respect of the corporation's separate status when it comes to creditors' claims (apart from those of the lender providing the funds for the transaction).

The possible detriment to creditors is exacerbated if the corporation's cash flow is not sufficient to service the loan. The bank eventually proceeds to foreclose on the corporation's assets and sells them at foreclosure prices, and leaves nothing for other creditors. Such foreclosure is frequently interrupted by the filing of a bankruptcy case. So it happened in this case.

Most courts that have considered the issue have decided that fraudulent transfer law should apply to LBOs. *See, e.g., Moody v. Security Pacific Business Credit,* 971 F.2d 1056 (3d Cir.1992); *Lippi v. City Bank,* 955 F.2d 599 (9th Cir.1992); *Mellon Bank v. Metro Communications, Inc.,* 945 F.2d 635 (3d Cir.1991); *O'Donnell v. Royal Business Group, Inc. (In re Oxford Homes, Inc.),* 180 B.R. 1 (Bankr.D.Me.1995); *In re Consolidated Capital Equities Corp.,* 143 B.R. 80 (Bankr.N.D.Tex.1992); *Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992 (S.D.N.Y.1991); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127 (Bankr.D.Mass.1989); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488 (N.D.Ill.1988). *See generally,* 4 Queenan, supra note 12, ch. 27; 3 Norton, supra note 12, ch. 58A. In fact, despite the reservations expressed in *Kupetz,* supra, and *Credit Managers Ass'n of Southern California v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal. 1985), there appears to be no published opinion to the contrary.[31]

It does not follow, however, that the fraudulent transfer analysis of an LBO will result in a recovery for the benefit of the bankruptcy estate. In both *Moody* and *Mellon Bank* the Third Circuit upheld the transactions at issue against the fraudulent transfer attack. In *Lippi,* similarly, the Ninth Circuit ruled in favor of some of the defendants, and remanded for further consideration as to the remainder.

Should all LBO's be exposed to fraudulent transfer challenge? Certainly not. Under this Court's analysis, two kinds of LBO's ordinarily escape fraudulent transfer attack. This includes many, if not most, LBOs.[32]

First, in a legitimate LBO,[33] in which the assets mortgaged by a corporation to support

---

**31.** *But see Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230 (10th Cir.1991), *cert denied,* 505 U.S. 1213, 112 S.Ct. 3015, 120 L.Ed.2d 887 (1992), where the court held that the trustee could not recover from selling shareholders of a publicly traded corporation because their payments constituted nonavoidable "settlement payments" under Bankruptcy Code § 546(e), 11 U.S.C.A. § 546(e) (West 1993).

**32.** In *Credit Managers Association v. Federal Co.,* 629 F.Supp. 175, 179 (C.D.Cal.1985), a district judge in this district stated, "it is not at all clear that fraudulent conveyance law is broadly applicable to [LBOs]." That court relied substantially on Baird & Jackson, supra note 12. Ten years of

court decisions and scholarly commentary since that decision have helped to refine the application of fraudulent transfer law to LBOs. Even the *Credit Managers* court, however, apparently would permit pre-transaction creditors, such as exist in this case, to attack an LBO. *Id.,* at 180–81.

**33.** In *Kupetz,* 845 F.2d 842 (9th Cir.1988), the Ninth Circuit stated:

> [W]e hesitate to utilize constructive [transfer law] to frustrate the purposes intended to be served by what appears to us to be a legitimate LBO. Nor do we think it appropriate to utilize constructive [fraudulent transfer law] to brand most, if not all, LBOs as illegitimate. We

an LBO do not exceed the net equity of the business (after appropriate adjustments), the transaction will not make the corporation insolvent, at least according to the balance sheet test.[34] If in addition it has sufficient projected cash flow to pay its debts as they come due, the cash flow solvency test is met, also. This leaves an LBO exposed to fraudulent transfer attack only if the margin of equity is too thin to support the corporation's business.

A second kind of LBO also escapes fraudulent transfer attack, even though it leaves the subject corporation insolvent. If the cash flow is sufficient to make the debt payments, the transaction also is unassailable. This ordinarily turns on two factors: the degree of risk of default undertaken in the first instance, and the degree to which projected economic developments impacting the business are not overly optimistic. These LBOs escape fraudulent transfer attack either because of good financial projections or because of good luck: either factor is sufficient.

■ The Court's view of the proper application of fraudulent transfer law to LBO's does not make the selling shareholders the guarantors of the success of the LBO. A legitimate LBO, as described supra, shifts the risk of failure off their shoulders. As to subsequent creditors, they should not be required to shoulder the risk if the failure is caused by outside forces not reasonably foreseeable at the time of the transaction. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir.1992) (failure caused by increased competition rather than lack of capital); *Credit Managers Association v. Federal Co.*, 629 F.Supp. 175, 186–87 (C.D.Cal.1985).

■ However, an LBO that is leveraged beyond the net worth of the business is a gamble.[35] A highly leveraged business is much less able to weather temporary financial storms, because debt demands are less flexible than equity interest. The risks of this gamble should rest on the shoulders of the shareholders (old and new), not those of the creditors: the shareholders enjoy the benefits if the gamble is successful, and they should bear the burdens if it is not. This, after all, is the role of equity owners of a corporation. The application of fraudulent transfer law to LBOs shifts the risks of an LBO transaction from the creditors, who are not parties to the transaction, back to the old and new shareholders who bring about such transactions. As Sherwin states:

> These parties, who are directly involved as the principal engineers and beneficiaries of the buyout, should bear the risk of negative consequences if the transaction does not in fact comply with the standards for creditor protection set out in the fraudulent conveyance statutes.... They should be accountable to creditors for the benefits diverted from the corporation if they knew or should have known ... of facts the court determines to establish a constructive fraud against creditors.

Sherwin, supra note 12, at 519.

■ How long should selling shareholders be exposed to the risk that an LBO will go bad? There is a traditional answer to this question: until the statute of limitations runs. Perhaps there should be a shorter statute of limitations for LBOs than the four to seven years that is common under the

---

cannot believe that virtually all LBO's are designed to "hinder, delay, or defraud creditors." *Id.*, at 848. The Court is in agreement with this dictum. In this Court's analysis, however, the Wolf & Vine LBO at issue in *Kupetz* was not apparently a legitimate LBO. The selling shareholders escaped liability, as the Ninth Circuit held, because of their good faith defense based on their lack of knowledge or inquiry notice of the leveraged feature of the transaction, and because the publicity of the transaction in the industry prevented subsequent creditors from being defrauded.

**34.** It makes sense to limit legitimate LBOs to transactions that do not leave a corporation insolvent. In a perfect world (as typically assumed by economists), an LBO would never run afoul of this rule, because the price paid for the stock would be the net equity in the firm. Baird & Jackson, supra note 12, at 851. Such an LBO would place the corporation on the verge of insolvency, but not beyond. In the real world, some LBOs leave corporations insolvent, perhaps because of imperfect information about the value of the corporation's stock.

**35.** *See* 2 Epstein, supra note 12, § 6–52 at 69–70.

UFTA. This is a decision for the legislature to make.

The Court perceives no unfairness in imposing the risks of an overleveraged LBO on the old and new shareholders who undertake the risks, rather on the creditors who do not intend to do so. Indeed, it is the selling shareholders who are ordinarily least worthy of sympathy in an LBO. As Epstein states:

> In the beginning of the transaction they are below existing creditors. In the end, they "cash out" and march off over the heads of the existing creditors. It is a neat trick of legal magic that allow the shareholders to subordinate, unilaterally, the creditors' claims.

2 Epstein, supra note 12, at 74.

### D. Good Faith Defense

The selling shareholders claim that they acted in good faith, and that this is a defense to the fraudulent transfer claim. From the earliest fraudulent transfer statutes, a good faith transferee for value has enjoyed an affirmative defense to the cause of action. See, e.g., 13 Stat.Eliz. ch. 5, § 6 (1570). However, this defense has been greatly restricted in recent statutes.

The UFTA, including California's version thereof, provides a complete defense to an intentional fraudulent transfer for a transferee who took "in good faith and for a reasonably equivalent value." UFTA § 8(a); Cal. Civ.Code § 3439.08(a) (West Supp.1995). This defense is not available for a constructive fraudulent conveyance, and thus is not applicable in this adversary proceeding.

A second good faith provision is contained in UFTA § 8(d) and the California Civil Code, which provide:

> Notwithstanding voidability of a transfer or an obligation under this chapter, a good faith transferee or obligee is entitled, *to the extent of the value given the debtor* for the transfer or obligation, to the following:
>
> (1) A lien on or a right to retain any interest in the asset transferred.

(2) Enforcement of any obligation incurred.

(3) A reduction in the amount of the liability on the judgment.

UFCA § 8(d); Cal.Civ.Code § 3439.08(d) (West Supp.1995) (emphasis added).[36]

In this case the selling shareholders gave up their shares of stock in the debtor in exchange for their payment of $3.5 million. However, this provision is not applicable in this case, because the shareholders did not transfer their shares or give any other value *to the debtor*. The shares went to BPI, the new parent corporation of Bay Plastics, and from there to Milhous. The debtor itself received neither shares nor money. This did not constitute "value given the debtor", within in the meaning of UFTA § 8(d) or California Civil Code § 3439.08(d). Thus the good faith defense fails.

## IV. CONCLUSION

Having found no triable issue of material fact, the Court concludes that the trustee is entitled to a summary judgment setting aside the constructive fraudulent transfer in this case to the selling shareholders. After having collapsed the series of transactions into a single transaction, the Court finds that in substance the selling shareholders received payment for their shares that was secured by the assets of debtor, and that this transaction defrauded an existing creditor. The payment to the selling shareholders is thus avoidable under UFTA § 5, as adopted in California in California Civil Code § 3439.05, which in turn is incorporated in Bankruptcy Code § 544(b).

---

**36.** Bankruptcy Code § 548(c) provides a transferee with a similar defense to a fraudulent conveyance claim to the extent of the value given to the debtor if such transferee acted in good faith. 11 U.S.C.A. § 548 (West 1993).