**PROTOCOMM CORP., Plaintiff,**

v.

**NOVELL ADVANCED SERVICES, INC., et al., Defendants.**

**No. 98–CV–3819.**

United States District Court, E.D. Pennsylvania.

Sept. 25, 2001.

David Smith, Schnader, Harrison, Segal & Lewis, Christina Rainville, Schnader, Harrison, Segal & Lewis, Jeannette M. Brian, Schnader, Harrison, Segal and Lewis, Jonathan S. Liss, Schnader Harrison Segal & Lewis LLP, Dionna K. Litvin, Schnader, Harrison, Segal & Lewis, Phila, for Plaintiff.

Christina Rainville, Schnader, Harrison, Segal & Lewis, Dionna K. Litvin, Schnader, Harrison, Segal & Lewis, Jennifer H. Adams, Morgan Lewis & Bockius, David C. Franceski, Jr., Stradley Ronon Stevens & Young, Philadelphia, PA, Richard L. Mattiaccio, Steven Skulnik, Pavia & Harcourt, New York City, Michael N. Feder, Mc Carter and English, LLP, Michael B. Pullano, McCarter & English, LLP, Timothy W. Callahan, II, James A. Keller, Saul, Ewing, Remick & Saul, Philadelphia, PA, Jane E. Willis, Ropes & Gray, Boston, MA, Martin Newhouse, Ropes & Gray, Boston, MA, Paul G. Nofer, Klehr, Harrison, Harvey, Branzburg & Ellers LLP,

Philadelphia, PA, Scott A. Birnbaum, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Morton R. Branzburg, Klehr, Harrison, Harvey, Branzburg & Ellers, Shari Amster, Klehr, Harrison, Harvey, Branzburg & Ellers, Seamus C. Duffy, Drinker, Biddle & Reath LLP, Robert A. Particelli, Drinker Biddle & Reath LLP, Arthur Makadon, Ballard, Spahr, Andrews and Ingersoll, Leslie E. John, Ballard, Spahr, Andrews & Ingersoll, Thomas C. Zielinski, Cozen & O'Connor, Robert V. Dell'Osa, Cozen and O'Connor, Sarah E. Davies, Cozen and O'Connor, Philadelphia, PA, for Defendants.

## MEMORANDUM

LOWELL A. REED, JR., Senior District Judge.

Two motions are presently before this Court in this third generation lawsuit which sprung from a breach of contract dispute between plaintiff ProtoComm Corporation ("ProtoComm") and Fluent, Inc., ("Fluent"), now Novell Advanced Services ("Novell").[1] Defendants Technology for Information and Publishing, L.P., David L. Nelson, Cornelius A. Ferris, and Premkumar Uppaluru (collectively referred to as "Former Fluent Shareholders") filed a motion for summary judgment (Document No. 67), pursuant to Federal Rule of Civil Procedure 56, and ProtoComm and remaining defendants Aenas Venture Corporation, ASCII Corporation, Cirrus Logic, Inc., FIP Associates Ltd. and FIP II, Ltd., and Intel Corporation (collectively referred to as "settling defendants") filed a joint motion to dismiss with prejudice all claims of plaintiff against such defendants (Document No. 76), pursuant to Federal Rule of Civil Procedure 41(a)(2) to which the Former Fluent Shareholders (also referred to as "non-settling defendants") object.

Upon consideration of the motions, responses and replies thereto, and for the reasons set forth below, I will deny in part and grant in part the motion for summary judgment and grant the joint motion to dismiss.

## I. Background[2]

This lawsuit has its roots in a case brought by ProtoComm against Fluent which alleged a breach of a contract to develop a video server software. ("ProtoComm I"). On July 24, 1996, a jury returned a verdict in favor of ProtoComm and against Fluent for $12.5 million. The Court of Appeals for the Third Circuit affirmed the verdict on October 29, 1997. The details of ProtoComm I and the suit which followed, ProtoComm II, have been detailed at length by this Court and will not be repeated here. The following background is relevant to this case, ProtoComm III, which involves at its core a complex transaction whereby Novell acquired Fluent while the ProtoComm I case was pending.

In or around January, 1993, Novell began investigating the possibility of investing in Fluent. (Mem. from Charlie York to Darrel Miller, David Bradford and Jim Tolonen, dated Jan. 8, 1993, Pl.'s Ex. 10; Mem. from Charlie York to Darrel Miller, David Bradford, Jim Tolonen and Jan

---

1. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 based upon the citizenship of the parties as diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. The facts laid out in this opinion are based on the evidence of record viewed in the light most favorable to the plaintiff ProtoComm. the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz,* 105 F.3d 863, 865 (3d Cir.1997).

Newman, dated Jan. 18, 1993, Pl.'s Ex. 12; Mem. from Charlie York to Ray Noorda, Darrel Miller, David Bradford, Jan Newman and John Edwards, dated Feb. 1, 1993, Pl.'s Ex. 13.) In February, 1993, Novell appeared "positive" toward making such an investment. (Pl.'s Ex. 13, explained supra.) This investment would go into Fluent's treasury. (Dep. of Neil Ferris at 51, Pl.'s Ex. 3.)

The ProtoComm I suit was filed on January 29, 1993. Upon discovering the lawsuit, Novell told Fluent that the investment activities would cease until the suit was settled. (Mem. from Charlie York to Ray Noorda, Darrel Miller, David Bradford, Jan Newman and John Edwards, dated Feb. 8, 1993, Pl.'s Ex. 14; Mem. from Charlie York to Roy Noorda, Darrel Miller, David Bradford, Jim Tolonen, Jan Newman and John Edwards, dated Feb. 17, 1993, Pl.'s Ex. 15.)

On March 19, 1993, David Bradford ("Bradford"), Novell's Senior Vice President and General Counsel, sent a draft letter of intent to Cornelius Ferris ("Ferris"), Fluent's President; the letter contemplated that the acquisition would take the form of an asset purchase. (Pl.'s Ex. 17.) On April 28, 1993, Bradford sent a letter of intent to Ferris; the letter contemplated that the acquisition would take the form of a stock sale in which Fluent would become a wholly owned subsidiary of Novell. (Pl.'s Ex. 18.) The letter of intent required as a condition precedent to the acquisition that "the lawsuit with ProtoComm be provided for to Novell's satisfaction." (*Id.* at 3.)

Where the April 28, 1993 letter of intent had included the language that Novell would acquire "all of the business, assets, and obligations of Fluent," the actual agreement, dated June 4, 1993, excluded such language. (Pl.'s Ex. 28.) The agreement did retain language pro-

viding that the ProtoComm litigation "shall have been resolved to the satisfaction of Fluent and Novell." (*Id.* at 5.2(j) and 5.3(e).) The proxy statement furnished to Fluent's stockholders in connection with the solicitation of proxies by Fluent's Board approving the agreement, introduces the acquisition as a "merger" constituting "a liquidation of the Company under the Charter." (Pl.'s Ex. 38 at 2.) On July 2, 1993, Paul Desjourdy, Fluent's attorney, sent a letter to Betty Depaola at Novell, detailing the disbursement of payments as a result of the acquisition. (Pl.'s Ex. 26.) The payment included, *inter alia*, employee bonus payments and noteholder payments. (*Id.*) Neither Bradford nor Cameron Read, Fluent's counsel for the transaction, could recall at their depositions why the acquisition evolved into a cash-for-stock transaction. (Dep. of Bradford at 231, 237, Pl.'s Ex. 11; Dep. of Read at 38, Pl.'s Ex. 25.)

The ProtoComm I lawsuit was discussed during at least three Board meetings. (Minutes from Feb. 4, 1993 at 1, Pl.'s Ex. 32; Minutes from Feb. 26, 1993 at 2, Pl.'s Ex. 33; Minutes from Mar. 22, 1993 at 1, Pl.'s Ex. 33.) The files of Read contained the complaint and the underlying agreement, as well as other ProtoComm related documents. (Dep. of Read at 18–31, Pl.'s Ex. 25.) Ferris originally testified at his deposition that at the final hours before the deal, Bradford requested that the deal be redone to set aside money for the potential judgment in the ProtoComm I suit. (Dep. of Ferris at 44–45, Pl.'s Ex. 43.) Ferris pleaded with Bradford not to make this change, and Bradford acquiesced. (*Id.*) Ferris later recanted this testimony. (Dep. of Ferris at 54–55, Pl.'s Ex. 3.) In June, 1993, Rob Hicks, an associate counsel at Novell, sent a fax to Dan Heist, President of ProtoComm, proposing a settlement in the ProtoComm I litigation.

(Defs.' Ex B17a.) David Smith, on behalf of ProtoComm, sent a counter proposal. (Defs.' Ex. B22.) A second proposal was then made by Novell. (Defs.' Ex. B52.)

On July 7, 1993, the acquisition occurred. Novell paid $18.5 million and assumed $3 million in liabilities. (Novell 1993 10–K, Pl.'s Ex. 47.) The litigation had not ended at the time of the closing.[3] (Dep. of Bradford at 88, Defs.' Ex. A.) On August 9, 1993, Ernst & Young sent Novell an asset valuation study of Fluent, in which the assets were valued at $21.55 million (Pl.'s Ex. 51 at 2.) Eventually, Fluent's assets, including, *inter alia*, Fluent's intellectual property and technology patents, as well as Fluent employees, were transferred to Novell. It is unclear to this Court when the transfer began. It seems that at least some employees were transferred onto the Novell payroll soon after the closing. (Fluent's Quarterly Tax Returns for September 30, 1993, Pl.'s Ex. 62; Fluent's Quarterly Tax Returns for December 31, 1993, Pl.'s Ex. 63.) It appears the technology assets were transferred by May, 1994. (Digital media data stream network management system, patent filed by Novell on Feb. 3, 1993, Pl.'s Ex. 53; assigned on Mar. 10, 1994, Pl.'s Ex. 54; trademarks assigned May 9, 1994, Pl.'s Ex. 55–56.)

ProtoComm's claim is essentially as follows: Although defendants called Novell's acquisition of Fluent a stock purchase, in reality, it was an asset sale designed to leave Fluent an empty shell and ProtoComm holding an uncollectible judgment. Fluent's assets were conveyed to Novell, and the purchase price was paid out either as a fraudulent conveyances or illegal dividends or both to Fluent's shareholders. Fluent was then left with nothing but obligations to ProtoComm.

The Former Fluent Shareholders essentially contend the following: On July 7, 1993, Novell purchased all of the outstanding stock of Fluent from the Fluent shareholders. After the stock sale occurred, Fluent became a wholly owned subsidiary of Novell and the stock sale ownership of Fluent passed to Novell. It was only after Novell's sales of Fluent's products were deemed disappointing that steps were taken to consolidate Fluent with Novell and to transfer the assets.

ProtoComm's claims against the Former Fluent Shareholders survived a motion to dismiss. *See ProtoComm Corp. v. Novell, Inc.*, 55 F.Supp.2d 319 (E.D.Pa.1999) ("ProtoComm III").

## II. Motion for Summary Judgment

### A. Legal Standard

In deciding a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the "test is whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir.1999) (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994)). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, "summary judg-

---

**3.** Bradford testified at his deposition that the language of the agreement did not mean that the litigation had to be settled. Rather that "it just had to be in a position where Novell was comfortable going forward, given its current state." (Dep. of Bradford at 71, Defs.' Ex. A.) According to Bradford's deposition testimony, the ProtoComm I litigation was only of "marginal" concern to Novell. (*Id.* at 220.)

ment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 250, 106 S.Ct. 2505.

The facts should be reviewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact and avoid summary judgment. *See Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

### B. Fraudulent Transfer Claim

■ The claim for fraudulent conveyances is brought under the Pennsylvania Uniform Fraudulent Conveyances Act ("PAUFCA"). 39 P.S. § 351 *et seq.*[4] The purpose of fraudulent transfer law is to prevent a debtor from transferring valuable assets for inadequate consideration if such transfer leaves the debtor with insufficient assets to pay honest creditors. *See In re Bay Plastics, Inc.*, 187 B.R. 315, 322 (Bkrtcy.C.D.Cal.1995). The uniform statute was established upon the recognition that debtors often try to avoid payment of legitimate debts by concealing or transferring property. *See In re Lease–A–Fleet, Inc.*, 155 B.R. 666, 672–73 (Bkrtcy.E.D.Pa. 1993). Conveyance is defined by statute as "every payment of money, assignment, release, transfer, lease, mortgage, or

pledge of tangible or intangible property, and also the conveyance of any lien or incumbrance." 39 P.S. § 351. Stocks are thus absent from this definition. A claim may be brought under this Act by a future creditor, i.e., by a party which has not yet received a judgment on a legal claim at the time of the transfer in question. *See Stauffer v. Stauffer*, 465 Pa. 558, 576, 351 A.2d 236, 245 (1976).

■ In my prior opinion, I concluded, *inter alia,* that ProtoComm could establish a claim for fraudulent conveyances upon showing that the stock transaction between the Former Fluent Shareholders and Novell was only part of a complex transaction that transferred assets of Fluent to Novell, paid money to the shareholders and left Fluent insolvent. *ProtoComm III*, 55 F.Supp.2d at 327–28. Analogizing to Leveraged Buyout ("LBO") cases, I concluded that upon such a showing, this Court would be convinced to treat the transactions among the Former Fluent Shareholders, Fluent and Novell as one integrated transaction for the purposes of ProtoComm's claim of fraudulent conveyances. *See id.* at 328.

In *U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), the Court of Appeals for the Third Circuit applied PAUFCA to LBOs for the first time. As articulated by the Court, a typical LBO involves the following:

> [A]company is sold to a small number of investors, typically including members of the company's management, under financial arrangements in which there is a minimum amount of equity and a maximum amount of debt. The financing typically provides for a substantial re-

---

4. This statute was later repealed and replaced by, 12 Pa.Cons.Stat. § 5101 *et. seq.;* however, because of when this lawsuit was filed, the

older statute governs this case. *See Proto-Comm III,* 55 F.Supp.2d at 323 n. 1.

turn of investment capital by means of mortgages or high risk bonds, popularly known as "junk bonds." *Id.* at 1292. *Tabor* involved an incredibly complex LBO in which the court "collapsed" separate transactions for the purposes of the claims brought under PAUF-CA. *See id.* at 1302. In summary, the President of Raymond Group ("Raymond"), James Durkin ("Durkin"), received an option to buy Raymond from its shareholders for $8.5 million. *See id.* After failed attempts to secure financing, Durkin and investors incorporated a holding company, Great American, to which the option was assigned. *See id.* To effectuate the buy-out, Great American, a seemingly empty company, received a loan commitment from Institutional Investors Trust ("ITT") for $8.5 million. *See id.* The loan was structured to divide Raymond into borrowing companies and guarantor companies and was secured by mortgages on assets of both groups of companies. *See id.*

The loan arrangement occurred in two stages. "The loan proceeds went from ITT to the borrowing Raymond Group companies, which immediately turned the funds over to Great American, which used the funds for the buy-out." *Id.* at 1302. The Court in *Tabor* upheld the district court finding that the ITT loan proceeds merely passed through the borrowers to Great American and in the end to the selling stockholders and could not be deemed consideration received by the borrowing companies. *See id.* Other courts have applied fraudulent conveyance to the LBO context and collapsed the transac-

tions for the purposes of fraudulent conveyance law. *See, e.g. In re Bay Plastics, Inc.,* 187 B.R. 315; *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Serv. Co.,* 910 F.Supp. 913 (S.D.N.Y., 1995). *See also Lease–A–Fleet,* 155 B.R. at 676 (applying *Tabor's* collapsing method to case outside LBO). In essence, courts look "past the form of a transaction to its substance" and evaluate the transactions on a whole to determine whether a fraudulent conveyance has occurred. *MFS/Sun Life Trust,* 910 F.Supp. at 933. Thus while each transaction in isolation may appear kosher, the full transaction is examined to determine whether fraudulent conveyance law has been violated.

Former Fluent Shareholders argue that no asset sale occurred and that Proto-Comm is unable to show that the stock sale was but one occurrence in a series of interdependent steps. ProtoComm counters that genuine issues of material fact exist as to both issues. At the motion to dismiss stage, ProtoComm appeared to rely solely on the collapsing theory. In other words, plaintiff sought to establish that the stock sale and the asset transfer which followed should be viewed as one transaction. Plaintiff now brings forth evidence which it argues raises a genuine dispute as to whether the initial transaction actually constituted an asset transfer. ProtoComm essentially relies on the same evidence for these alternative theories which in reality do not differ significantly because the end result is the same: Proto-Comm needs to show that an asset transfer, as opposed to a stock sale, took place.[5]

---

5. A brief review of basic corporate law principles may be helpful to the discussion here. There are three principal acquisition methods used to effectuate a corporate acquisition, two of which are relevant here: acquisition of assets and acquisition of stock. *See* Eleanor M. Fox & Byron E. Fox, 1 *Corporate Acquisi-*

*tions and Mergers* § 5A.01, at 5A–4 (Matthew Bender 2001). In an acquisition of assets, the acquiring corporation acquires "all or part of the assets of the transferor corporation either in exchange for shares of its stock, securities, cash or other property." *Id.* at 5A–5. The transaction can be molded by the parties at

ProtoComm's expert witness, Michael Pakter ("Pakter"), characterizes the acquisition as an asset sale.[6] In addition to Pakter's expert opinion, ProtoComm points to the following evidence, *inter alia*, to demonstrate that genuine issues of material fact exist concerning what type of transition occurred. According to Novell's 10–K the acquisition cost $21.5 million. Instead of distributing cash on a pro rata basis to the Former Fluent Shareholders, the cash was distributed at the direction of Fluent's Board and included monies for employee bonuses and reimbursements for bridge loans. The Ernst & Young Report, while admittedly conducted *after* the stock transaction occurred, valued the assets of Fluent at approximately the same price as the acquisition cost. ProtoComm also relies on the fact that early in the negotiations, an asset sale was considered and then the structure changed without explanation. In the backdrop of the transaction was the looming potential judgment from the ProtoComm I litigation. Thus, under ProtoComm's theory defendants knew that if the deal was in the structure of an asset transfer, they would potentially be liable under fraudulent transfer law. I conclude based on the foregoing that ProtoComm has raised a genuine issue of material fact

as to the predicate issue of whether the stock transfer was actually an asset sale. Plaintiff has established evidence under which a reasonable trier of fact could find either that the initial transaction in June, 1993, was actually an asset sale, or, alternatively, that the initial transaction was not complete until the assets were physically transferred.

 I now turn to whether plaintiff raises genuine issues of material fact with respect to the specific provisions of PAUFCA. Four sections of the Act detail situations in which a conveyance will be deemed fraudulent. Sections 354 and 355 are the constructive intent provisions of the Act.[7] Both provisions require that the conveyance occur without "fair consideration" which occurs "when property of a fair equivalent is transferred in good faith." *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 251 (3d Cir.2000) (citing section 353). "[K]nowledge of insolvency is a rational interpretation of the statutory language of lack of 'good faith.'" *Tabor*, 803 F.2d at 1296. Section 354 provides that a conveyance is fraudulent where the debtor was left insolvent at the time of the transfer or becomes insolvent thereby.[8]

---

their own choosing, "so long as appropriate safeguards are provided for the interests of corporate shareholders and creditors." *Id.* at § 5A.03, at 5A–11–12. In other words, the acquisition cannot be in the form of a fraudulent transfer. After the sale, the transferor can choose to engage in active business, or pay creditors, liquidate, and formally dissolve. *See id.* In an acquisition of stock, "the acquiring corporation purchases the shares owned by the individual shareholders of the transferor corporation for cash, stock, securities or other property." *Id.* at § 5A.01 at 5A–5. The acquiring corporation or one of its subsidiaries becomes a shareholder of the acquired corporation. *See id.* at § 5A.04 at 5A–16.

6. This Court has ruled on the admissibility of Pakter's testimony in a separate opinion dated September 26, 2001.

7. This Court recognizes that in its prior ruling it observed that Section 356 was also a constructive intent provision. It appears that most courts place this section or its equivalent in that category. *See, e.g., In re Bay Plastics, Inc.*, 187 B.R. at 322; *MFS/Sun Life*, 910 F.Supp. at 936. The Court of Appeals for the Third Circuit, however, has construed this section as an actual intent provision. *See Moody v. Security Pacific Bus. Credit. Inc.*, 971 F.2d 1056, 1063–64 (3d Cir.1992). I must be guided accordingly by this holding.

8. Section 354 provides: "Every conveyance made and every obligation incurred by a per-

The statute encompasses insolvency both in the bankruptcy sense, i.e., a negative net worth and in the equity sense, i.e., inability to pay existing debt as they mature.[9] *See Buncher*, 229 F.3d at 251. Section 355 provides that a conveyance is fraudulent where the debtor was left with unreasonably small capital after the transfer which indicates "a financial condition short of equitable insolvency."[10] *Moody v. Security Pacific Bus. Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir.1992). The test is one of "reasonable foreseeability." *Id.* at 1073. The main inquiry under the constructive intent provision is "whether there is a link between the challenged conveyance and the debtor's insolvency." *Id.*

■ If insolvency or unreasonably small capital is established, the burden shifts to the transferees, the Former Fluent Shareholders, to show by clear and convincing evidence either that the transferor was then solvent, not rendered insolvent, not left with unreasonably small capital or that the assets were transferred for fair consideration. *See Elliott v. Kiesewetter*, 98 F.3d 47, 56–57 (3d Cir.1996) (citations omitted); (*Moody*, 971 F.2d at 1065 n. 2) (noting belief that Pennsylvania Supreme Court would apply insolvency standard to adequacy of capital standard; standard determined in dicta because court concluded

that clear and convincing standard had been met). Thus, the first question is whether ProtoComm has raised a genuine issue of material fact as to either Fluent's solvency at the time of the transfer or as a result of the transfer, as required under section 354, or as to whether the transfer left Fluent with unreasonably small capital, as required under section 355. These issues are in large part dependent on how the fact finder characterizes the acquisition. For example, the trier of fact could reasonably find that a legitimate stock-for-cash transaction took place which had no impact on Fluent's assets, or it could reasonably find that an asset sale occurred which was structured to deplete Fluent's treasury. Thus, I conclude that a genuine issue of material fact has been raised as to the required elements of sections 354 and 355.

■ Sections 356 and 357 are the actual intent provisions of the Act. Section 356 also requires that the conveyance be made without fair consideration; it provides that a conveyance is fraudulent where the debtor intends or believes that it was unable to pay future debts as they became due as a consequence of the transfer.[11] Again, the issue raised by this provision turns in large part on how the fact finder sees the acquisition. For example, if it is found to

---

son who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration."

9. Insolvency is deemed to occur "when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." 39 P.S. § 352.

10. Section 355 provides: "Every conveyance made without fair consideration, when the person making it is engaged, or is about to

engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent."

11. Section 356 provides: "Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

be a exchange for stock and that Fluent's assets were transferred only after Fluent's products did not reach expectations, then the requisite intent and unfair consideration may be unfounded. If, however, an asset transfer is found, then the structure of the acquisition could reasonably be seen as a transfer made without proper consideration to Fluent's treasury and with the intent or belief that creditors could not be satisfied. Thus, I conclude that a genuine issue of material fact has been raised as to the required elements of section 356.

■ The final question under PAUFCA concerns section 357 which provides that a conveyance is fraudulent where the conveyance was made with the actual intent to hinder, delay or defraud present or future creditors.[12] Such intent must be proven by clear and convincing evidence. *See Moody v. Security Pacific Bus. Credit Inc.*, 127 B.R. 958, 990 (W.D.Pa.1991), *aff'd*, 971 F.2d 1056 (1992). The existence of actual intent is a question of fact. *See Tabor*, 803 F.2d at 1304. Direct evidence is not required; actual intent may be inferred from the totality of the circumstances. *See Moody*, 971 F.2d at 1075 (citing *Tabor*, 803 F.2d at 1304).

Thus this Court must ask whether ProtoComm has raised a genuine of material fact in showing by clear and convincing evidence that defendants intentionally structured the acquisition to defraud creditors. This question of fact, though ProtoComm will face a higher burden of proof,

overlaps with the aforementioned provisions because under Pennsylvania law, intent may be inferred when transfers are made without fair consideration and where the parties to the transfer have knowledge of the claims of creditors and know that such creditors cannot be paid. *See Tabor*, 803 F.2d at 1304. *See also, Lease–A–Fleet*, 155 B.R. at 674 (reciting "badges of fraud" which may indicate actual intent). As explained above, genuine disputes remain concerning these questions. Thus, I conclude that ProtoComm has met its burden in raising a triable issue.

I therefore conclude that defendants are not entitled to judgment on the PAUFCA claim as a matter of law.

### C. Wrongful Dividend Claim

■ Plaintiffs bring the wrongful dividend claim under 8 Del. C. § 174, which holds directors, but not shareholders, liable for wilfully or negligently paying dividends in violation of the general corporate law chapter of the Delaware Code.[13] ProtoComm brings this cause of action against those Former Fluent Shareholders who served as Directors. There are times when upon consideration of a summary judgment motion, cases are reevaluated in light of the facts presented and determinations previously made by a court are reconsidered as well. This is one of those times. This Court concluded in its prior opinion that ProtoComm had standing to pursue this claim. *ProtoComm*, 55

---

**12.** Section 357 provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

**13.** Section 174 provides in pertinent part: "In case of any wilful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable." Section

173 provides in pertinent part: "No corporation shall pay dividends except in accordance with this chapter." Section 170 provides in pertinent part: "The directors of every corporation ... may ... pay dividends upon the shares of its capital stock ... either (1) out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such surplus, out of its net profits."

F.Supp.2d at 330. This Court now concludes, for the reasons which follow, that plaintiff lacks such standing.

The Delaware Supreme Court's decision in *Johnston v. Wolf,* 487 A.2d 1132 (Del. 1985), governs standing under section 174. The facts of *Johnston* are as follows. Allied Artists Pictures Corporation ("Allied") entered into a complex reorganization plan and agreement which provided, *inter alia,* that Allied would merge with another corporation. *See id.* at 1134. As part of the plan, Allied redeemed its preferred stock prior to the merger. *See id.* Under the agreement, as well as under Delaware law, creditors of Allied became creditors of the post-merger corporation. *See id.* Plaintiffs alleged that the redemption violated the Delaware Code. *See id.*

Two plaintiffs filed suit after the merger occurred and, obviously, therefore had not secured a judgment before the merger occurred. *See id.* at 1136. One plaintiff had brought his claim prior to the merger, but had not obtained a judgment until after the merger. *See id.* The court denied standing as to all three plaintiffs under section 174, holding that all three were creditors of the post-merger corporation only. *See id.* Thus, unlike PAUFCA, section 174 provides no protection to future creditors. Accordingly, I conclude that plaintiff cannot proceed with its claim against these defendants under section 174 because ProtoComm did not receive its judgment until after the acquisition of Fluent had occurred.

In this Court's prior ruling, it turned to *Pinellas County v. Great Am. Indus. Group Inc.,* No. 90 C 5254, 1991 WL 259020 (N.D.Ill.Dec. 2, 1991). There, the plaintiff had obtained a $25,000,000 judgment against defendant Madison. *See id.* at *1. Before the judgment against it, Madison had engaged in two corporate acts which rendered it insolvent. *See id.*

In the first act, Madison paid a $5 million dividend to its sole shareholder, GAIG. *See id.* Plaintiff claimed that the dividend payment should be voided. *See id.*

The court acknowledged that under *Johnston,* only current creditors had standing to sue under section 174. *See id.* at *3. The court then noted that section 174 would not have application even if standing were not problematic because the plaintiff was suing a shareholder and not a director. *See id.* The court then turned to 8 Del.C. § 325 which provides:

(a) When the officers, directors or stockholders of any corporation shall be liable *by the provisions of this chapter* to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any 1 or more of them, and *the complaint shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.*

(b) No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which such person is an officer, director or stockholder, *until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.*

(emphasis added). Thus, section 325 allows for a suit to be brought against officers, directors or stockholders when, under the provisions of the general corporate law chapter of the Delaware Code, they are liable to pay the debts of the corporation. And, such suit may not be brought until judgment is obtained and returned unsatisfied. The court in *Pinellas* determined that section 325 could not provide a cause of action to the plaintiff before it because Delaware statutory corporate law provided no means for holding shareholders liable for corporate debts. *See Pinel-*

*las,* 1991 WL 259020, at *3. The court then acknowledged that section 325 does not work to restrict causes of action traditionally available to creditors independent of corporate law. *See id.* (citing *Lone Star Indus., Inc. v. Redwine,* 757 F.2d 1544, 1554 (5th Cir.1985)).

The court observed that under Delaware common law, where a corporation distributes assets to its shareholders while leaving creditors unsatisfied, those creditors are entitled to recovery directly from the shareholders, without resort to fraudulent conveyance law and without having to first obtain a prior judgment against the corporate debtor. *See id.* The court ultimately concluded that because the complaint alleged that the dividend payment occurred at a time when Madison was technically bankrupt, and thus constituted substantially all of Madison's assets, the allegations were sufficient to sustain the claim to void the dividend payment. *See id.*

Thus, the court in *Pinellas* did not determine that section 325 could be used to provide standing for a claim brought under section 174. Rather, the court essentially provided that the cause of action be brought under the common law fraudulent conveyance claim. Accordingly, while it may be that ProtoComm would have a common law claim under Delaware law, which presumably would require a similar showing to the claim brought under PAUFCA, ProtoComm does not have a claim against these defendants under section 174, which is the law invoked by plaintiff.[14]

---

**14.** ProtoComm appears to argue that section 325 can be invoked as a way to require defendants to pay the uncollectible judgment from the contract dispute litigation of ProtoComm I. Plaintiff does not direct this Court to the specific provision under the relevant chapter of the Delaware Code which would make

### III. Joint Motion to Dismiss

■ ProtoComm and settling defendants move to dismiss with prejudice all claims brought against such defendants. Federal Rule of Civil Procedure 41 governs dismissals and provides in pertinent part:

> (1) **By plaintiff; by stipulation** . . . . [after an answer has been filed] an action may be dismissed by the plaintiff without order of court . . . (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action . . . . (2) **By Order of Court.** Except as provided by paragraph (1) of this subdivision rule, and action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.

Fed.R.Civ.P. 41. Because the non-settling defendants, who make up Fluent's Former Shareholders, oppose the motion, Rule 41(a)(2) is the controlling provision. It must be observed that the non-settling defendants have brought no cross claims against the settling defendants.

Whether to grant or deny such a motion falls within the sound discretion of this Court. *See Sinclair v. Soniform Inc.,* 935 F.2d 599, 603 (3d Cir.1991) (citing *Ferguson v. Eakle,* 492 F.2d 26, 28 (3d Cir. 1974)). The purpose of the rule is primarily to prevent dismissals which would result in some clear legal prejudice to the defendant. *See Spring City Corp. v. American Bldgs. Co.,* Nos. Civ. A. 97–8127, 98–105, 1999 WL 1212201, at *1 (E.D.Pa. Dec. 17, 1999); *Environ Prod., Inc. v. Total Containment, Inc.,* No. Civ. A. 94–7118, 1995

shareholders, or those shareholders who were directors, liable for such a claim. From the plain language of the provision, the complaint must state this ground. *See* 8 Del. C. § 325(a). Rather, plaintiff relies on section 174 under which, as explained, it lacks standing.

WL 459003, at *4 (E.D.Pa. July 31, 1995). Where a plaintiff moves for a voluntary dismissal *with prejudice* " 'it has been held that the district court must grant that request.' " *Spring City*, 1999 WL 1212201, at *1 (quoting Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2367, at 318 (2d ed.1995)). *See also Gilbreth Int'l Corp. v. Lionel Leisure, Inc.*, 587 F.Supp. 605, 614 (E.D.Pa.1983) ("where the plaintiff has consented to dismissal with prejudice and the defendants will not face a second lawsuit on plaintiff's claim, the Court should grant the motion for dismissal so long as it is not unfair to the defendant to do so.") (citations omitted).

Rule 41 allows for the dismissal of fewer than all defendants. *See Langer v. Presbyterian–Univ. of Pa. Med. Ctr.*, Civ. A. No. 87–4000, 1988 WL 33880, at * 2 (E.D.Pa. April 5, 1988); *Plasterer v. Hahn*, 103 F.R.D. 184, 185–86 (M.D.Pa.1984). In *Plasterer*, the plaintiff filed suit under the Eighth Amendment against multiple defendants. Subsequently, the plaintiff and one of the defendants filed a joint motion to dismiss under Rule 41. The remaining defendants opposed the motion, arguing that they would be prejudiced. The court rejected their argument, noting that (1) no cross claims had been filed asserting that the moving defendant was wholly or partially responsible; (2) the remaining defendants could still avoid liability at trial by arguing that the moving defendant had been responsible; and (3) their rights to indemnification and contribution were unaffected. *See Plasterer*, 103 F.R.D. at 186. *See also Langer*, 1988 WL 33880, at *2–3 (adopting reasoning in *Plasterer* ). The Court in *Plasterer* also noted that even had a cross claim been filed, the moving defendants still would have a right to have the plaintiff's claim against them dismissed and would have remained in the case as third-party defendants. *See id.*

(quoting *Broadway & Ninety–Sixth St. Realty Corp. v. Loew's, Inc.*, 23 F.R.D. 9, 11–12 (S.D.N.Y.1958)). *See also Country–Wide Produce, Inc. v. H. Sacks & Sons, Inc.*, No. 88 Civ. 0408, 1992 WL 369928, at *1 (S.D.N.Y. Nov. 25, 1992) (acknowledging that while Rule 41 limits dismissals where counterclaims are pending, it purposefully allows for no such protection where cross-claims are pending). Accordingly, I conclude that the non-settling defendants presently before this Court will not be prejudiced by the dismissal of the settling defendants.

Non-settling defendants invoke Pennsylvania's Uniform Contribution Among Joint Tort-feasors Act, 42 Pa.C.S.A. § 8321, *et. seq.*, which provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S.A. § 8326.

As the face of the statute makes clear, for the Act to apply, " 'it is necessary to establish that those allegedly culpable are joint tortfeasors.' " *Carr v. American Red Cross*, 17 F.3d 671, 683 (3d Cir.1994) (quoting *Rocco v. Johns–Manville Corp.*, 754 F.2d 110, 114 (3d Cir.1985)). As a result, under Pennsylvania law, "a defendant has the right to require a codefendant settling on a pro-rata release to remain in the case through trial and verdict to establish joint tortfeasor status." *Id.* (quoting *Rocco v. Johns–Manville Corp.*, 754 F.2d 110, 114 (3d Cir.1985)) (citing *Davis v. Miller*, 385 Pa. 348, 351–52, 123 A.2d 422, 424 (1956)).

If, however, the settling parties concede joint tortfeasor liability in the release, a so-called "Griffin release," the need to keep a settling co-defendant in the suit drops out. *See id.* (citing *Griffin v. U.S.*, 500 F.2d 1059 (3d Cir.1974)).

The parties to the joint motion have not shown the releases to this Court or to opposing parties. Non-settling defendants essentially argue that the joint motion cannot be evaluated without reference to the releases. They take the position that if the release states that the defendants are joint tortfeasors or that the issue of joint and several liability is waived, then the settling defendants do not have to participate in the trial. If, on the other hand, no such concessions were made, the settling defendants must remain in the case to determine the status of joint tortfeasor liability.

The glaring problem with the objections raised by the non-settling defendants is that they have failed until now to raise the issue of joint tortfeasor status. As stated, the non-settling defendants never filed a cross-claim, nor asserted any affirmative defense in their answer raising such a defense, and do not even attempt to do so now. I note in passing that the time to do so seems to have clearly passed. The complaint also does not allege that defendants are joint and severally liable. Succinctly put, the issue of joint tort-feasor liability is not properly before this Court. If non-settling defendants had wished to raise such a claim, they could have, but did not, so the issue has been waived in this case. I therefore conclude that the motion will be granted.

## IV. Conclusion

To summarize, this Court concludes that plaintiff has raised triable issues on the claims brought under PAUFCA and that plaintiff lacks standing to bring a wrongful dividend claim under the Delaware Code. Thus, I will grant in part and deny in part the motion of Former Fluent Shareholders for summary judgment. The joint motion of plaintiff and settling defendants will be granted, as the non-settling defendants have failed to show any reason the remaining defendants must stay in the case.

An appropriate Order follows.

## ORDER

**AND NOW** this 25th day of September, 2001, upon consideration of the motions of defendants Technology for Information and Publishing, L.P., David L. Nelson, Cornelius A. Ferris, and Premkumar Uppaluru (collectively referred to as "Former Fluent Shareholders") for summary judgment (Document No. 67), pursuant to Federal Rule of Civil Procedure 56, and the joint motion of plaintiff ProtoComm Corporation ("ProtoComm") and remaining defendants Aenas Venture Corporation, ASCII Corporation, Cirrus Logic, Inc., FIP Associates Ltd. and FIP II, Ltd., and Intel Corporation (collectively referred to as "settling defendants") to dismiss with prejudice all claims of plaintiff against such defendants (Document No. 76), pursuant to Federal Rule of Civil Procedure 41(a)(2), and the responses and replies thereto, and for the reasons set forth in the foregoing memorandum, it is hereby **ORDERED** that:

1. The motion for summary judgment is **GRANTED** in part and **DENIED** in part. It is **GRANTED** only as far as it moves this Court to dismiss the claims brought under the Delaware Code for a wrongful dividend. *See* 8 Del. C. § 174. It is **DENIED** as far as it moves this court to dismiss claims brought under the Pennsylvania Uniform Fraudulent Conveyances Act. *See* 39 P.S. § 351 *et seq.*

2. The joint motion to dismiss is **GRANTED** and all claims of plaintiff against Aenas Venture Corporation, ASCII Corporation, Cirrus Logic, Inc., FIP Associates Ltd. and FIP II, Ltd., and Intel Corporation are **DISMISSED** with prejudice.